BOOTH et al. v. CITY OF NEW YORK.

CITY OF NEW YORK v. BOOTH et al.

(District Court, S. D. New York. December 4, 1903.)

1. SHIPPING—INJURY TO SCOW THROUGH BREAKING ADRIFT IN STORM—INEVITABLE ACCIDENT.

Libelants contracted to purchase from the city of New York a few scow loads of street sweepings for use in filling in at a wharf, the price to include towing the boats to and from the wharf and unloading. While one of the scows, in charge of a master employed by the city, was lying at the wharf, which under ordinary circumstances was a safe place, a storm of unusual severity suddenly came up, and she broke her lines,

and was drifted on shore and injured. *Held*, that libelants were chargeable, at most, with only ordinary care for the protection of the boats, and were not liable for the loss because they failed to move the scow to a safer place, which they were unable to do after the necessity for greater protection appeared, but that the loss must be attributed to inevitable accident.

In Admiralty.

Alexander & Ash, for Booth and others.

George L. Rives and E. Crosby Kindleberger, for the City of New York.

ADAMS, District Judge. The first of these actions was brought by Booth et al., hereinafter called the libellants, to recover from the city the sum of $144.50 for lines furnished to Scow No. 22, belonging to the city, while lying at a wharf, about 400 feet long, on the eastern bank of the Hudson River, at Irvington on the Hudson, on the 5th of December, 1902, and the further sum of $260 for a balance of services rendered in towing the city scows to sea in the latter part of December of the same year. The defence to the first claim is that the scow at the time was under the control of the libellants and that they furnished the lines in pursuance of their duty to care for her. In answer to the claim for balance of towage, the city sets up a claim for damages arising out of the neglect of the libellants to perform their duty to the scow, by reason of which, it is claimed, she broke loose from the wharf on the said 5th day of December and was injured to the full extent of the libellants' claim. The amounts claimed are not in dispute.

The second of the actions was brought by the city to recover from the libellants the damages last referred to, amounting to $260.

The libellants were engaged in filling in the wharf in question and the scow No. 22 went there with some material which was to be used for that purpose. The scow was employed under a proposal contained in the following letter:

"New York, November 29th/2

Hon. John McGaw Woodbury,
Commissioner, Department Street Cleaning.

Dear Sir:—We desire a few scow loads of street sweeping material to go to Irvington on the Hudson River, and we propose to take them at the following prices:—

Small Scows at $65.
Large Scows at 70.
Ex. Lge. " at 85.
Sp. Lge. " at 95.

These prices include the towing to and from and unloading. We trust that you will be able to give us the small amount that we need for this job, and we would like to have three tomorrow.

Yours truly,
Booth, Dailey & Ivins."

This letter contained at the foot an acceptance by the city as follows:

"New York Dec. 3 1902
APPROVED,
John McG. Woodbury
Commissioner."

The following letter, dated December 3, 1902, was sent by the city to the libellants, but was not mailed until the 12th of December nor received by them until the 13th of December:

"New York, December 3, 1902.

Messrs. Booth, Dailey and Ivins,
   13-21 Park Row, New York City.

Gentlemen:—Referring to your communication of the 29th ult., in which you say that you desire a few scow loads of street sweeping material to go to Irvington on the Hudson River, and that you propose to take them at the following prices:

| | | |
|---|---|---|
| 'Small' scows, | $65. | each. |
| 'Large' scows, | $70. | " |
| 'Ex.Lge.' " | $85. | " |
| 'Sp.Ex.Lge.' scows, | $95. | " |

these prices to include the towing and unloading. I accept the same it being understood that this is a day to day agreement to be terminated at any time by me.
Respectfully,
John McG. Woodbury, Commissioner.

P. S. It is understood that you are to be responsible for the safety of the scows while in your possession.
John McG. Woodbury

Received Dec. 13th,
   Booth Dailey & Ivins
      Brookins
A. W. B.
   J. D. D."

This letter was sent after the event, and it is not contended by the city that it forms any part of the contract, which arises out of the acceptance of the libellants' proposal, contained in their letter of November 29th.

On the morning in question, the libellants had a dredge and a light scow lying at the southern end of the face of the wharf. No. 22 was lying on the face further north, and north of her were two other scows, lying side by side. Under ordinary circumstances, the wharf was a perfectly safe place for mooring but on this morning, a sudden storm from the north or northwest arose and made it un-safe. At the beginning of the storm, the libellants moved their dredge and scow around to the southerly end, where they were pro-tected. They received some slight damage in moving but after-wards suffered no injury. The lines of No. 22, with which she was originally moored became strained and parted, hence the necessity of the new lines, which were furnished at the request of the master of the scow and are the subject of the libellants' first claim. These also parted finally and the scow drifted down the river and got ashore on the eastern bank of the river, some 400 or 500 feet below the wharf.

There is no doubt about the suddenness and severity of the storm. Many other craft were injured in the vicinity and the accident was inevitable, unless the libellants failed in some duty prior to the time when the storm became too severe for precautions. It is urged by the city that the libellants were under practically the same duty to the scow that they were to their own boats, which they succeeded in saving. The city had a master on the scow, who was in charge of her for the city. This man was not produced on the trial be-cause he could not be found. It was evidently his duty to look out

for the scow, as he represented the city on board, but even if some measure of duty was owing from the libellants, it was ordinary care at the most. It can not be found that there was any omission of ordinary care in failing to move the scow around to the lower end of the wharf. When it became obvious that the scow was in danger, that place was already occupied by the libellants' dredge and scow. Their lines ran to the end of the wharf, so that no room was left for the city's scow, unless she was moored outside of the scows lying outside of the dredge and it would have been difficult and dangerous to move the scow at that time. The attempt would have involved a risk that the libellants were not called upon to assume. Nor does it appear that the facilities were available to render the attempt a success. The libellants did make an effort to get the tug boat "Success," which was in charge of a dredge, five mud scows and a water boat, that went ashore near at hand in the beginning of the storm, but the master declined the service, stating that he had enough on hand, although the tug was not aground. When the libellants moved their own boats, the weather was not in their judgment bad enough to injure the scow, but it very shortly became more severe with the effect of breaking the scow away from the wharf altogether. The storm fully accounts for the loss and was its proximate cause.

Decree for the libellants for the sum of $404.50, with interest. The libel of the city is dismissed.